IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DONNA WILLIAMSON, :

    Plaintiff, :

                       Case No. 3:08CV387

    vs. :
                       JUDGE WALTER HERBERT RICE

DAYTON CHILDREN'S MEDICAL :
CENTER,
                       :

    Defendant.

---

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DOC. #13), AS IT PERTAINS TO THE CLAIM
FOR FMLA RETALIATION, AND DISMISSING SUPPLEMENTAL STATE
LAW CLAIMS FOR AGE AND GENDER DISCRIMINATION, WITHOUT
PREJUDICE TO REFILING IN A STATE COURT OF COMPETENT
JURISDICTION; JUDGMENT TO ENTER IN FAVOR OF DEFENDANT
AND AGAINST PLAINTIFF; TERMINATION ENTRY

---

    The Defendant, Dayton Children's Medical Center ("Children's Hospital" or "the Hospital"), hired the Plaintiff, Donna Williamson, in July 2000, as an IS educator/coordinator. In September 2007, Williamson was diagnosed with fibromyalgia and respiratory conditions, at which time she applied for and was granted intermittent leave, under the Family Medical Leave Act ("FMLA"). In April 2008, the Hospital terminated Williamson, for what it describes as a culmination of violations of its attendance and discipline policies. Williamson brings suit, claiming that the Hospital discharged her, instead, as a result of age and gender discrimination (in violation of state law) and in retaliation for taking FMLA leave (in

violation of federal law). The Court has federal question jurisdiction over this case, under 28 U.S.C. § 1331, with supplemental jurisdiction over the related state law claims, under 28 U.S.C. § 1367.

Children's Hospital has moved for summary judgment on all three claims. The Court will begin its analysis of the Hospital's Motion by setting forth a summary of the pertinent facts and then turn to a review of the standard that guides its summary judgment decisions. Following that, the Court will consider the merits of the Motion that is presently before it.

I. Facts[1]

 A. Hospital Attendance and Discipline Policy

According to the Hospital's discipline policy ("Discipline Policy"), the Hospital will generally follow three steps, in the event of employee misconduct, to wit: (1) written warning; (2) final written warning; and (3) termination. Doc. #13-1 (Discipline Policy) at 8-9. Further, "[a]n employee generally moves to the next step in the procedure even if the disciplinary action is based on a new or different performance/conduct issue." Id. at 8. One of the behaviors that may result in disciplinary action is a "[p]attern of failure to report for duty at the assigned time

---

[1]Since this case comes before the Court on the Defendant's Motion for Summary Judgment, the Court sets forth the facts and circumstances giving rise to such Motion in the manner most favorable to the Plaintiff, as the party against whom the Motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments, 475 F.3d 783, 790 (6th Cir. 2007).

2

and place." Id. at 9. According to the Hospital's Senior Human Resources Generalist, Ann Good, warnings become a permanent part of an employee's file once they are issued. Doc. #13-1 at 2 (Good Aff.) ¶ 5. "Thus, once an employee receives a Written Warning or Final Written Warning, the employee generally progresses to the next step under the [Discipline Policy] for future performance or conduct issues, regardless of the reason or how long ago he or she received the Written Warning or Final Written Warning." Id.

Turning to the Hospital's attendance policy ("Attendance Policy"), that policy defines an "occurrence" as "an absence [that] has not been scheduled in advance." Doc. #13-1 (Attendance Policy) at 11. Time off for FMLA leave is not considered as an occurrence. Id. at 12. The Attendance Policy allows for seven occurrences, either due to absence or tardiness (presumably within a rolling twelve month period), without discipline. The Attendance Policy then goes on to direct as follows:[2]

- Eighth occurrence - verbal warning
- Ninth occurrence - written warning

---

[2]The Attendance Policy becomes confusing here. It initially defines the word "occurrence" to include multiple days of absence (e.g., "[u]nscheduled absences of two (2) of more consecutive workdays for personal illness will be charged as one (1) occurrence"), but then reverts to using the word "absence" to refer to the event that triggers movement on the attendance discipline scale. Doc. #13-1 at 11-15. In the present case, there is no dispute about whether Williamson had accumulated a sufficient number of absences/occurrences/tardies to trigger the disciplinary steps of the Attendance/Discipline Policies.

3

- Tenth occurrence - final written warning

- Eleventh occurrence - termination

Id. at 13-14. The Attendance Policy also states that it "works in coordination" with the Hospital's Discipline Policy. Id. at 11; Doc. #14 at 10 (Good Dep. at 34-37). Ann Good provides the following example to illustrate how the policies work together:

> Thus, for example, an employee, who has a combination of unscheduled absences and tardiness/leave early occurrences, but has never received formal discipline under the [Discipline Policy] for any reason, would typically receive a Verbal Warning after her eighth occurrence in a rolling 12-month period, a Written Warning after the ninth occurrence in a rolling 12-month period, and a Final Written Warning after the tenth occurrence in a rolling 12-month period. After the eleventh occurrence, the employee would be subject to termination. However, assuming, for example, that prior to reaching eight occurrences, this same employee had received a Final Written Warning under the [Discipline Policy] for some unrelated misconduct, then the Final Written Warning would be the employee's starting point for attendance related discipline. At eight occurrences in a rolling 12-month period, therefore, the employee would be subject to termination.

Doc. #13-1 (Good Aff.) ¶ 7. It is this interplay between the two policies that the Hospital ultimately relied upon in terminating Williamson.

### B. Information about Williamson

In July 2001, Williamson received a "final written warning".[3] Doc. #19 at

---

[3] No information is pointed to in the record as to how or when Williamson received the "written warning" that necessarily preceded the "final written warning" she received in July 2001. However, both parties precede on the

4

17-18 (Williamson Dep. at 65-66); Doc. #19-6 (Final Written Warning). The warning was issued as a result of a "serious breach of confidentiality", occasioned when Williamson improperly accessed patients' personal, medical records. Doc. #19-6 (Final Written Warning). Six years later, in September 2007, Williamson applied for and was granted FMLA leave, the purpose of which was to enable her to take intermittent time away from work to tend to her fibromyalgia and respiratory conditions. Doc. #19 at 23 (Williamson Dep. at 86).

In January 2008, Hospital administrators determined that, as of August 2007, Williamson had accumulated nine combined absence/tardy occurrences (not FMLA related) in the immediately preceding twelve-month period.[4] Doc. #17 at 21 (Falzerano Dep. at 79-81); id. Ex. 19. Senior Human Resources Generalist Good determined that, because Williamson had previously received a final written warning, the Hospital could have then terminated her for the Attendance Policy violation, pursuant to the three step disciplinary process provided for in the Discipline Policy. Doc. #13-1 at 2 (Good Aff.) ¶ 10. Good decided not to terminate Williamson, however, because she

> decided it was not consistent with Dayton Children's general practices to discipline Plaintiff in January 2008 for a violation that had occurred

assumption that such a warning existed.

[4]It would seem that the ensuing process could have been triggered upon the happening of an eighth combined occurrence, but apparently the Hospital did not realize Williamson had an excessive number of absences/tardies until she had already accumulated nine such.

5

>several months earlier in August 2007. Thus, I advised Ms. Falzerano
>to discuss the Attendance Policy with Plaintiff and inform Plaintiff that
>she had exceeded the number of permissible occurrences and that she
>would be subject to disciplinary action for any further violations of the
>Attendance Policy.

Id. ¶ 10. Lori Falzerano, Williamson's supervisor, relayed the information about the attendance issues to Williamson, although there is disagreement as to how the information was relayed. According to Falzerano, the two had a performance review meeting, on January 31, 2008, where she showed Williamson a list of the absence/tardy dates and they discussed the same. Doc. #17 at 4-5, 21 (Falzerano Dep. at 13-16, 79-81). According to Williamson, however, Falzerano merely told her to "keep an eye on [the attendance issues] in a casual conversation." Doc. #22 at 18 (Williamson Dep. at 63).

In mid-February 2008, Williamson requested time off for a vacation. Doc. #19 at 18 (Williamson Dep. at 67-69); see also Doc. #25-1 at 3-4 (Emails between Falzerano and Williamson, dtd. Feb. 18, 2008). According to Williamson, Falzerano informed her that a senior administrator, Beth Fredette, had said that Williamson could not take time off "due to FMLA absences." Id.; Doc. #15 at 2 (Fredette Dep. at 4-5). According to email correspondence between Falzerano and Williamson, Falzerano informed Williamson that she did not have enough accumulated Personal Time Off ("PTO") to take the vacation, to which Williamson replied: "Understandable. Just didn't know if I could do it without pay." Doc. #25-1 at 3-4 (Emails between Falzerano and Williamson, dtd. Feb. 18, 2008).

6

In April 2008, Williamson had two attendance "occurrences" which caused her to once again have nine combined absence/tardy occurrences in the previous twelve-month period, thus, exceeding the seven occurrences allowed under the Attendance Policy. Doc. #13-1 (Good Aff.) ¶ 11; Doc. #21-6 (List of Occurrences, 4/07-4/08). Based on this violation, along with the Final Written Warning that she had received in 2001, Good and Falzerano determined that Williamson's termination was appropriate under the Discipline Policy and, thus, recommended that the Hospital terminate her.[5] Doc. #13-1 (Good Aff.) ¶ 11. Good sought and obtained approval of the termination recommendation from Lisa Coffey, Vice President for Corporate Support. Id. On April 23, 2008, Good and Falzerano met with Williamson to confirm that none of the absences that the Hospital had attributed to the latest disciplinary infraction were FMLA absences and then to inform her of the Hospital's decision to terminate her employment. Id. ¶¶ 12, 13.

According to Good, the Hospital has terminated other employees who,

---

[5]In her memorandum in opposition, the Plaintiff states that she was terminated "merely two days after [she took] protected leave under FMLA." Doc. #21 at 7. However, she points to nothing in the record to support the contention regarding the FMLA leave that allegedly occurred two days prior to her termination.
On another point regarding her termination, the Plaintiff also contends that when Good terminated her she told Williamson not to bother filing a grievance, because "Beth has made her decision." Id. at 7. Although her deposition provides support for this contention (see Doc. #19 at 21 (Williamson Dep. at 78)), the Plaintiff provides no evidence as to what role "Beth" (presumably Fredette) played in her termination. Thus, the Court will rely on the unrebutted evidence set forth by the Defendant, which indicates that Good and Falzerano made the initial decision to terminate Williamson, which decision was then approved by Coffey. Doc. #13-1 (Good Aff.) ¶ 11.

7

like Williamson, received a Final Written Warning and then, several years later, engaged in conduct that was in violation of Dayton Children's Medical Center's policies, but was unrelated to the employee's Final Written Warning. Id. ¶ 15.  As an example, she points to a 43 year old woman whom the Hospital discharged in July 2008, for violating a policy, after having received a Final Written Warning for an unrelated reason in January 2003. Id.

II. Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991).  "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing

8

summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. <u>Celotex</u>, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." <u>Mich. Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" <u>Hancock v. Dodson</u>, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. <u>Anderson</u>, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather,

credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. Analysis

    A. FMLA Claim

The FMLA permits eligible employees to take a total of twelve weeks of leave during any twelve month period for one or more of the following reasons:

(A) the birth of a child; (B) the adoption of a child or the placement of a child with the employee for foster care; (C) to care for a family member with a serious health condition; (D) because of a serious health condition that prohibits the employee from performing the functions of his or her position; or (E) because of a qualifying exigency in the Armed Forces. 29 U.S.C. § 2612(a). Employees may take FMLA intermittently with the employer's permission. 29 U.S.C. § 2612(b)(1).

The Sixth Circuit has recognized that "the FMLA 'was clearly intended to provide [] protection' against 'discharg[ing] or discriminat[ing] against an employee for exercising her rights under the Act.'" Bryant v. Dollar Gen. Corp., 538 F.3d 394, 400 (6th Cir. 2008) (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 160 n.4 (1st Cir. 1998) (alterations in original); other citations omitted). The following provisions of the Act provide the foundation for such claims:

> (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this [Act].
>
> (2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this [Act].

29 U.S.C. § 2615(a). The Sixth Circuit has recognized that subparagraph (1) of this Section provides a theory of recovery based on an "entitlement" or "interference" theory," which make it unlawful for employers to interfere with or deny an employee's exercise of her FMLA rights. Bryson v. Regis Corp., 498 F.3d

561, 570 (6th Cir. 2007) (citing <u>Arban v. West Publ'g Corp.</u>, 345 F.3d 390, 400-01 (6th Cir. 2003)).  Subparagraph (2), on the other hand, establishes a "retaliation or "discrimination" theory of recovery, which prohibits an employer from discharging or discriminating against an employee for "opposing any practice made unlawful by the Act." <u>Id.</u>  The Sixth Circuit has recognized that claims for retaliatory discharge are cognizable under either of the two provisions. <u>Wysong v. Dow Chem. Co.</u>, 503 F.3d 441, 447 n2 (6th Cir. 2007).

In order to prove a *prima facie* case of FMLA retaliatory discharge, a plaintiff must show that (1) she availed herself of a protected right under the FMLA by notifying her employer of her intent to take leave, (2) she was discharged from her position, and (3) a causal connection exists between the two actions. <u>Skrjanc v. Great Lakes Power Serv. Co.</u>, 272 F.3d 309, 314 (6th Cir. 2001) (citation omitted).  Absent proof of direct evidence of discrimination, courts apply the three-step balancing test set forth in <u>McDonnell Douglas Corporation v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

> Under McDonnell Douglas, [the employee] must first prove a prima facie case of discrimination.  The burden then shifts to [the employer] to articulate a legitimate, nondiscriminatory reason for [the employee's] discharge.  If [the employer] articulates such a reason, then [the employee] has the burden of showing that the articulated reason is in reality a pretext to mask discrimination.

<u>Skrjanc</u>, 272 F.3d at 315 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802-06).

In the present case, there is no question that the Plaintiff took FMLA leave

12

or that the Defendants terminated her, thus satisfying the first and second prongs of her *prima facie* case. The question the Court must resolve, then, is whether there is a causal connection between her FMLA leave and her termination.

The Plaintiff argues that a causal connection is evidenced by Fredette's statement, in February 2008, that the Plaintiff could not take time off for a vacation "due to FMLA absences" and also because, at the time of her termination, Good had the Plaintiff confirm that none of the absences that had triggered the latest disciplinary action were FMLA absences. Doc. #21 at 16, 18. The Defendant argues that such evidence is insufficient to demonstrate a causal connection between the Plaintiff's FMLA leave and her termination. The Court agrees for several reasons.

As to Fredette's statement, the Court notes that the statement was made in February, yet the Plaintiff was not terminated until April 23, 2008. Thus, the timing weighs against the conclusion that Fredette's alleged animus caused the Plaintiff's termination. Further, the unrebutted evidence indicates that Good and Falzerano made the decision to terminate the Plaintiff and said decision was approved by Lisa Coffey, Vice President for Corporate Support, with no showing that Fredette played any role, let alone a decisive role in the termination decision. Thus, even assuming that Fredette's statement demonstrated a discriminatory animus against the Plaintiff, as the Court must do at this stage of the litigation, such is not enough to demonstrate a genuine issue of material fact on causation.

Further, as to Good asking the Plaintiff to confirm that none of the absences that had triggered the latest disciplinary action were FMLA absences, the Court fails to see how such a question links the Hospital's decision to terminate the Plaintiff with her qualification for and use of FMLA leave. On the contrary, it leans towards demonstrating caution, on behalf of the Hospital, to ensure that it had not miscalculated the properly chargeable absences, before imposing disciplinary action. The Plaintiff having provided no cogent explanation of how Good's question demonstrates the requisite causal connection,[6] the Court concludes that it does not create a genuine issue of material fact on causation.

In conclusion, the Plaintiff has not set forth sufficient evidence to prove the third element of her *prima facie* case of FMLA retaliation. Therefore, summary

---

[6]In an attempt to support her contention that Good's questioning of Williamson (to confirm that none of the absences that had triggered the latest disciplinary action were FMLA absences) was evidence that the termination decision was caused by her FMLA status, Williamson argues as follows (without citation):

> This statement by Ms. Good seems to suggest that Good sees Plaintiff's burden as needing to relate her termination to some particular FMLA absence. This interpretation not only misreads the law but is also at odds with the facts. Defendant's fixation on Plaintiff's FMLA certification was not related to particular FMLA absences by Plaintiff, much less to non-FMLA absences. Defendant's fixation was on Plaintiff being certified for FMLA leave as needed due to her fibromyalgia. Defendant was viewing Plaintiff as an employee with a bundle of leave time including FMLA.

Doc. #21 (Pl.'s Mem. Opp'n) at 18. The Court is uncertain as to the thrust of Plaintiff's argument, but is convinced that Good's inquiry demonstrates no genuine issue of material fact as to a causal connection, as explained above.

judgment in favor of the Defendant is warranted. However, in an abundance of caution, the Court will assume, arguendo, that Plaintiff has made a *prima facie* case and will proceed with an analysis of the remainder of the McDonnell Douglas balancing test.

The Plaintiff acknowledges that the Defendant has articulated a legitimate, nondiscriminatory reason for her discharge (the violation of the Attendance/ Discipline Policies), yet argues that the Defendant's reason is a mere pretext for FMLA discrimination. In support thereof, she seems to be arguing that the Defendant handled her non-FMLA absences in a far less serious fashion than it handled her FMLA absences, as evidenced, for example, by Good's decision not to terminate her in January 2008, when she first determined that the Plaintiff had exceeded her allowable non-FMLA absences/tardies, as compared to the scrupulousness with which Good handled the review of the Plaintiff's FMLA absences at the time of her termination. Doc. #21 (Pl.'s Mem. Opp'n) at 18-19. The Court fails to see how these, or any other facts on the record, demonstrate that the Defendant's reason for terminating the Plaintiff is a pretext for discrimination.

The Sixth Circuit instructs that an employee may establish pretext by demonstrating that the employer's stated reason "(1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct." Upshaw v. Ford Motor Co., 576 F.3d 576, 586 (6th Cir.

2009) (citing Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)).  Further,

> The plaintiff must produce "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against him."  "The jury may not reject an employer's explanation . . . unless there is a sufficient basis in the evidence for doing so."

Id. (quoting Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003) and Manzer, 29 F.3d at 1083).  In the present case, the Plaintiff has not pointed to sufficient evidence from which a jury could reasonably reject the Defendant's explanation (the third-step violation of the Discipline Policy, which calls for termination) and infer, instead, that its reason had no basis in fact, did not actually motivate the termination decision or is insufficient to explain the same.

Not only has the Plaintiff not pointed to facts sufficient to create a genuine issue of material fact, on the issue of pretext, the Defendant persuasively argues that the fact that it did not terminate the Plaintiff, in January 2008, when it first discovered that she had exceeded the allowable number of non-FMLA absences/ tardies under the Attendance Policy, indicates that its reason was not pretextual.

In support of its argument, the Defendant points to an unpublished Sixth Circuit decision, wherein the Court was considering whether an employer's decision not to promote an employee was caused by a discriminatory animus based on the employee's age. Lahar v. Oakland County, 2008 U.S. App. LEXIS 24603, 304 Fed. Appx. 354 (6th Cir. Dec. 4, 2008).  Albeit in its consideration of the

causal connection prong of the plaintiff's *prima facie* case (rather than in a consideration of pretext), the Appellate Court made the following observation, which is apt to the issue presently before this Court:

> [T]he employer's restraint in not disciplining the employee closer in time to the protected conduct creates an inference of non-retaliation, not one of retaliation. An employer bent on retaliating against an employee is more likely to act as soon as the employee gives it the chance, not wait until a second or third problem arises - - as happened in this case.

Id. at *14. Had the Defendant, in the present case, intended to discriminate against the Plaintiff because of her FMLA status, it could have terminated her when it first determined that she had exceeded the allowable number of chargeable absences/tardies, in January 2008 (i.e., used the violation of the Discipline Policy as a pretext for its discriminatory animus against the Plaintiff). The Defendant did not terminate the Plaintiff, at this time, however. Had the Plaintiff never again exceeded the allowable number of absences/tardies (or committed another infraction of the Discipline Policy), there is no indication on the record that the parties would have ever made an appearance before this Court. It was only when the Plaintiff once again exceeded that number of permitted Attendance Policy occurrences that the Defendant decided to terminate her. (The Court finds it of no consequence whether the Defendant adequately warned the Plaintiff of this eventuality, given that the result was provided for in the Attendance/Discipline Policies.) Thus, the facts support a conclusion that the Defendants <u>did</u> <u>not</u> terminate the Plaintiff as a pretext for FMLA retaliation, rather than creating a

17

genuine issue of material fact, on this issue.

Given that the Court has concluded that the Plaintiff has failed to create a genuine issue of material fact, both as to her *prima facie* case of FMLA retaliation and as to pretext, the Court SUSTAINS the Defendant's Motion for Summary Judgment (Doc. #13), with regard to the Plaintiff's claim for FMLA retaliation.

B. State Law Claims for Age and Gender Discrimination

At this stage of the litigation, the only remaining claims are the Plaintiff's state law claims for age and gender discrimination. As the Sixth Circuit instructs, "a federal court should typically decline to exercise pendent jurisdiction over a plaintiff's state-law claims after dismissing the plaintiff's federal claims." Brown v. Cassens Transp. Co., 546 F.3d 347, 363 (6th Cir. 2008) (citing 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130 (1966)). Because the Court has now disposed of the Plaintiff's only federal claim and given that the Court's jurisdiction over this litigation is based on federal question jurisdiction, with only supplemental jurisdiction over the related state law claims, it dismisses the remaining supplemental state law claims, without prejudice to refiling in a state court of competent jurisdiction.

IV. Conclusion

The Defendant's Motion for Summary Judgment (Doc. #13) is SUSTAINED,

as it pertains to the claim for FMLA retaliation. The Plaintiff's only federal claim having been disposed of, her state law claims for age and gender discrimination are dismissed, without prejudice to refiling in a state court of competent jurisdiction.

Judgment will be ordered entered on behalf of the Defendant and against the Plaintiff.

The above captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

February 2, 2010

                                                      /s/ Walter Herbert Rice
                                                    WALTER HERBERT RICE, JUDGE
                                                    UNITED STATES DISTRICT COURT

Copies to:
Counsel of record